## BLANCHE A. KUSSMAUL *v.* DUPLEX MOTION PICTURE INDUSTRIES, INC.

[No. 41, January Term, 1929.]

*Decided April 19th, 1929.*

The cause was argued before BOND, C. J., ADKINS. OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*William H. Lawrence* and *Charles S. H. Lockman,* with whom was *J. Gabriel Ulman* on the brief, for the appellant.

*Robert F. Leach, Jr.,* for the appellee.

ADKINS, J., delivered the opinion of the Court.

This is an action of deceit, and grew out of the sale of shares of stock by the Duplex Motion Picture Industries, Inc., appellee, the defendant below, to Blanche A. Kussmaul, appellant, the plaintiff below. The *narr.* alleges that in the spring of 1925, the defendant, through its agents and servants by divers misrepresentations and statements induced

the plaintiff to believe that the corporate stock of defendant was a sound, attractive, investment, and paid a return of twelve per centum thereon to the holders thereof; that, in reliance upon said representations, the plaintiff purchased from the defendant 1,800 shares of said stock and paid therefor the sum of $5,050, and agreed to purchase, in addition, 800 shares and paid on account thereof the sum of $1,800; that the said shares were of no value and the worth thereof was not as represented, and that said stock did not and does not pay a return of twelve per centum, and was and is a highly speculative and undesirable investment; that plaintiff, upon the discovery of the worthless character of said stock, made demand upon defendant to return the money so paid to it, rescinded the contract for the additional shares subscribed for, and offered to return the certificate for the original 1,800 shares, but the defendant refused to accept the same and to return the money paid.

Issue was joined on the general issue plea, and at the conclusion of testimony on both sides the court directed a verdict for the defendant. This appeal is from the judgment entered on that verdict. The only exception is to the prayer withdrawing the case from the jury.

The plaintiff testified that she was unmarried, had little education, was fifty-two years old and had always worked as a cook; that a salesman of defendant saw her at the home of a Miss Grace Young, her cousin, where he was demonstrating moving pictures, and dozens of times after that in the kitchen where plaintiff was working; that he told her the stock was a good investment, she would not be a penny out on it, that she would be independent, wouldn't have to work all her life; that "I would—Oh, have it good, and he said that New York, the Governor of New York was in back of it, and the Sherman Bank of Brooklyn was back of it, and he said they were in business for eighteen years and he said if we weren't satisfied with our stock we could get it back, and then when we wrote for the money we couldn't get it back"; that he told her the stock was paying twelve per cent. "and probably they will pay more"; that plaintiff had received no dividend on the stock.

Grace B. Young testified that the salesman told her they had been paying twelve per cent. for the last eighteen years, and that Mr. John B. Baer (chairman of the Blue Sky Committee) had given them "the whole full right to sell it in Maryland under the Blue Sky Law and he also said that Mr. Baer backed this stock very highly, and said it was a clean little stock for anybody, to put their money in for an investment"; that the salesman also told her that duPont wanted to buy the controlling interest in the concern and they would not let him have it. It does not appear however, that Miss Young communicated any of these representations to plaintiff, or that she ever heard of them. Mr. Baer testified that he doesn't remember ever having seen defendant's salesman; that he certainly never personally recommended the stock. Plaintiff testified that the representation as to Mr. Baer was not made to her.

The defendant offered testimony tending to prove that the company owned several lots on Long Island, and that their present factory, a six story building, was bought in 1924 and cost $250,000, subject to a mortgage of $197,000, and that the mortgage at the time of the trial was $164,000; that the authorized capital stock of the company was 1,000,000 shares, par value $1 per share; that defendant began the sale of stock in the spring of 1923, and when the company came to Baltimore in June, 1925, and offered stock there, about 750,000 shares of the stock had been sold; that at different periods the stock had been offered at varying prices from $1 per share to $5, none for less than $1; that the board of directors fixed the price at which the stock was to be sold at a given period and during that period none was sold by the company except at that price; sometimes agents of the company or others might during that period be selling stock purchased for their own account at a higher price; that the proceeds of sales had been used to pay for buildings, machinery and equipment, and for fourteen patents which the company, when it was organized in May, 1923, took over from its predecessor, the Duplex Machine Company, which then occupied a two and a half story building; that at the present time defendant is

doing business, making and selling all its various products and occupying all but one floor of its six story building; that in January, 1924, the company paid a dividend of 4½ per cent. on a semi-annual basis; a six per cent. dividend was paid in July of that year, in January, 1925, 6 per cent., and in July, 1925, a stock dividend of 6 per cent.; that the company was still making all the machines represented in their book and others since designed; that the company sold its machines to all the large moving picture producers; they also sold to the Ford Motor Company; that they had designed and perfected a little moving picture machine for use in homes and had sold and delivered a thousand of them, but took back most of them because by the time they had completed the machines the film market had changed so that the size of the film they had made these machines to take was no longer purchasable; that they had spent several hundred thousand dollars in preparing to manufacture these new machines between March and November, 1925, and began delivering them in November, 1925; that they had not been able as yet to finance the operation of remodelling the new machines to fit the present size of films, but still held the patents and expected to make the necessary changes and put the machine on the market as soon as they could arrange to finance it, and were then doing the work of changing the parts; that witness personally came to Baltimore and opened a bank account in the bank in the Maryland Trust Building and talked with the man who was in charge, who told witness there was a committee in Baltimore that "looked over each proposition that was sold here," and witness went to the man he was told to go to, Mr. Paul Y. Waters, who asked him all the questions he cared to, and witness went over the thing in detail with him, submitted the literature he had and presented him the whole proposition, and witness said, "Now if there is anything I have got to do, I want you to tell me what it is, because we want to comply with any of your regulations"; that Mr. Waters sent the company a questionnaire, which was filled out and returned to him, and they did everything they knew about to comply with the regulations before they offered any stock in Baltimore,

other than what they had offered through the mail before opening an office there; that the company sold between $200,000 and $240,000 worth of merchandise between January 1st, 1924 and December 15th, 1924; that the purpose of buying the larger building was to give them room to manufacture the little moving picture machines; that the business to which defendant succeeded was begun by the Carlton Brothers in 1902, and witness has personal knowledge that they ran the business from 1906 to 1923; that the salesmen who represented defendant in Baltimore are no longer in its employ and witness does not know where they are.

There was no contradiction of any of defendant's testimony and there is nothing in the record to indicate that defendant is a fraudulent concern. According to several witnesses of plaintiff, defendant's salesmen made representations to them that appear to have been untrue, but it does not appear that any such representations were made to plaintiff or that they ever came to her knowledge. We can find in the record no representation of anything as an existing fact, made to or heard by plaintiff, which was shown to be untrue, or as to the falsity of which there was any evidence. *Boulden v. Stillwell*, 100 Md. 543.

It is strongly urged by appellant that there was enough in the testimony of the president of the defendant company to carry the case to the jury. The contention is that there is a conflict between two statements made by this witness as to the dividend paid in July, 1924, one of which, if believed by the jury, would have tended to prove that the dividends paid for that year were less than 12 per cent. But we do not find that either of the statements made by the witness would show that; and therefore there is no such question raised by the record. It is not necessary therefore for us to decide what would be the effect of such a conflict if such a question were presented.

The witness testified that there were cash dividends of 4½ per cent. and 6 per cent. in January and July, 1924, respectively. After an interruption by counsel, the witness continued: "In 1924 in July there was an additional dividend

of 4½ per cent." He also said there was a cash dividend of 6 per cent. in January, 1925. Afterwards he explained that the 4½ per cent. dividend, which he had said was paid in July, was not paid in July but in January, 1924. It is apparent that the witness, who was using a memorandum to refresh his recollection, inadvertently looked at the January, 1924, dividend when he said a dividend of 4½ per cent. was paid in July, 1924. At any rate he promptly withdrew his statement that a dividend of 4½ per cent. was paid in July. But if we were disposed to doubt the good faith of the witness in making his explanation, the question raised would be, not whether, according to this testimony, less than 12 per cent. was paid for 1924, but whether the amount paid was 12 per cent. or 15 per cent.; for he never withdrew his statement that 6 per cent. was paid in July. When he mentioned 4½ per cent. as a dividend paid in July, he spoke of it as "an additional dividend." It seems perfectly clear, however, that his testimony showed dividends for that year of 12 per cent.

Unfortunate, therefore, as the situation of plaintiff appears to be, and regrettable as it is that a hard-working woman should have been induced by the smooth tongue of a not too scrupulous salesman to invest all her savings in stock of a speculative character, we are unable to give her relief, as we find no error in the ruling appealed from. Courts cannot act as guardians for the over credulous, deplorable as their plight may be, and often is.

*Judgment affirmed, with costs to appellee.*